| | |
|---|---|
| ZEON CHEMICALS, L.P.<br><br>and<br><br>UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 72D | FMCS Case No. 17-55474-7<br><br>Issue: Termination<br><br>Grievant: Allen Jenkins<br><br>Stephen L. Hayford: Arbitrator |

<u>Preliminary Statement</u>

The Parties submitted this Matter to the Arbitrator at a hearing held on February 16, 2018, in Louisville, Kentucky. The Arbitrator completed the exchange of the Parties' post-hearing on April 6, 2018.

<u>Appearances</u>

    <u>For the Company</u>:

    Richard Cleary                     Attorney and Spokesperson

    Barbara Swartz                 Human Resources Manager and Witness

    <u>For the Union</u>:

    David O'Brien Suetholz          Attorney and Spokesperson

    Allen Jenkins                   Grievant and Witness

    Mac McFall                      President

    Jim Clark                       Vice-President and Witness

EXHIBIT B

I.   BACKGROUND AND FACTS

    The Company hired the Grievant, Allen Jenkins, on April 10, 1995. At the time of his April 3, 2017, termination Mr. Jenkins was the senior Relief Operator at the Company's Louisville, Kentucky Rubbertown Plant. Jenkins was discharged after accumulating 12 points under the Zeon Chemicals Kentucky Plant Attendance Control Policy (the ACP) set out in the Parties' Collective Bargaining Agreement.

    The ACP is a "no-fault" attendance policy. Pursuant to that Policy, bargaining unit employees are assessed points for being tardy, leaving work early, being absent from a scheduled shift and for "no call/no shows." Absences due to vacation days, funeral leave, jury duty, militarily leave, approved bank days, union business and days approved and designated as Family Medical Leave Act (FMLA) leave are not assigned points under the ACP. Absences of one to seven consecutive days due to the same illness or injury that are supported by a physician's note dated contemporaneously with the missed days and presented immediately upon the employee's return work are counted as one occurrence under the ACP. All other absences are counted as individual occurrences.

    The ACP centers on a point system that provides as follows.

-   Each absence is charged with two points.
-   An absence with a dated doctor's certification presented on the day of return to work is charged with one point.
-   A Tardy is charged with one point.
-   Leaving a shift early is charged with one point.
-   An absence that is not reported by the employee in a timely manner before the beginning of the shift ("no call/no show") is charged with three points.

ACP points are tracked on a rolling 12-month calendar. Pursuant to that rolling 12-month calendar scheme, points assessed under the Program are deducted from an employee's point rolling points total upon the 12-month anniversary of the date upon which the points were assessed.

    Employees who accrue points under the ACP are subjected to a four-step progressive disciplinary procedure summarized below.

STEP ONE
Upon the accrual of six points in any 12-month period, an employee is given a coaching session/verbal warning by his direct supervisor.

STEP TWO
Upon the accrual of eight points in any 12-month period, an employee is given a written warning.

STEP THREE
Upon the accrual of 10 points in any 12-month period, an employee is given a final written warning and a one-day suspension without pay. If an employee has 20 or more years of service, as a final step in the disciplinary process the Company may, at its discretion, impose a 30-day suspension as an alternative to termination "in effort to impress upon the employee the gravity and severity of the situation."

2

STEP FOUR

Upon the accrual of 12 points in any 12-month period, an employee is terminated.

The evidence in hearing record reveals no significant attendance-related events in Mr. Jenkins' employment record until calendar year 2014. Jenkins started 2014 with 8.5 accrued ACP points. During the year, his points total ranged from a high of nine points during three intervals to a low of 1.5 points at the end of the 2014 calendar year. The Grievant received a written warning on June 20, 2014 and a second written warning on July 30, 2014.

Mr. Jenkins began the 2015 calendar year with 3.5 accrued ACP points, his lowest point total for the year. His highest accrued points total during that year was 10.5 points. Jenkins received a verbal warning on May 17, 2015, a written warning on May 28, 2015, a final written warning on June 12, 2015, a verbal warning on August 7, 2015 and a written warning on November 29, 2017.

At the beginning of the 2016 calendar year Mr. Jenkins accrued ACP points total was 7.5 points. Jenkins lowest accrued points total for the year was 3.0 points. HIs highest accrued points total during for the year was 8.5 points. At the end of 2016, the Grievant had 7.5 ACP points. He received a written warning on March 26, 2016, a verbal warning on June 22, 2016, a written warning on July 10, 2016 and a written warning on November 10, 2016.

Mr. Jenkins began the 2017 calendar year with 7.5 accrued ACP points, his lowest accrued points total for the year. His highest accrued points total was 12.5 points, achieved on March 29, 2017.

The series of events that eventually triggered Mr. Jenkins' termination began on or about July 15, 2016. At that time, Jenkins and his two daughters were in Florida visiting his father.[1] At the hearing in this Matter, the Grievant testified as follows with regard to the events of that day.

Well, it all started when I was in Florida with my children, and it's been mentioned that my father for my whole life has been an alcoholic. He had been drinking that day as usual. We were coming back from the marina.

He was driving separate, and I was driving separate. I come around the corner. The neighbor was outside. I waved to the neighbor. I go home to my parents' house, and I was like, well, what's my dad doing? He's not back yet. It's three houses down.

He comes in all agitated and saying that he got into an argument with the neighbor, and I want you to come down here and get my grinder; he's talking bad about you. I'm like, oh, come on. What are you talking about?

So then my dad drags me -- well, not drags me, but I go down with my dad to defend my dad. So I go down there. I asked the neighborhood for the grinder, which it was a hand -

---

[1] There is no evidence in hearing record to indicate the city in Florida where these events transpired. The only evidence documenting the altercation at the core of this controversy is the Company Exhibit 2 booking and charge documents, which do not indicate the city in which these events took place.

it was a big bench grinder. He had it over a year, the neighbor did, and my dad wanted it back.

So I asked him for it. We were saying bad words to each other, the neighbor and I. Then when he came out, he threw the grinder at me. When he did - I mean, it's a heavy thing, and I deflected it, and I started saying bad words to him again.

Then when I went down to pick it up, he popped me in my face which left a bloody lip, but I didn't fall down. The neighbor two houses down saw what was going on and . . . (Transcript, page 153, line 4 to page 154, line 10).

.    .    .    .    .    .

When he hit me, I didn't fall back, and I had a selfie stick from when my kids and I were at putt-putt earlier and at the marina as well, as I mentioned. I pulled it out and started hitting him.
We were on an empty lot, and I started hitting him to get him away from me. As he did that, his wife came running around yelling "stop." I'm in part of their yard now, and he runs into his garage and grabs a crowbar and comes out and hits me.
So I've got a bloody lip and I'm bleeding here. He didn't have nothing wrong with him. At the time, I said, come on, let's go. I grabbed the grinder and took off to my dad's house.
I didn't have my phone with me at the time. It was at my parents'. I instantly called 911, which they have a recording and everything on that. The police showed up. But they ended up calling, too.
The police were talking to me and asked me first if I wanted to press charges. I said, no, we both hit each other. I said, I just want to be done away with this; I just want to be done away with it all. But he ended up wanting to press charges against me, so I ended up getting arrested (Transcript, page 154, line 25 to page 156, line 1).

Although Mr. Jenkins chose not to file charges against his father's neighbor, the neighbor did file charges against him.

As a result of the events of July 15, 2016, Mr. Jenkins eventually was charged with three counts of criminal conduct – two counts of battery (one a felony battery charge) and one count of unarmed burglary of an unoccupied dwelling (Company Exhibit 2). Jenkins testified further that when it came time for adjudication of the charges against him in March 2017, he chose to plead guilty to the charges. He explained that decision as follows.

And then when the time came for like work, I didn't know what was going to happen until around February/March. March is when I found out everything, the sentencing, and what it came down to was I pled guilty because I was a little scared that I could - they said, you could face prison time if you don't end up winning the case.

They said that we would do adjudicated/withheld, and once you do your probation, it will be - it'll be off your record. You won't have any kind of record of this, and you can just do home incarceration and work. That was the decision at the time.

But I said, well, I can't do that. I said, I live in Kentucky. My attorney was, like, talk to the judge. The judge said, okay, let's do this then; do 30 days in jail, and that will be the end

of it, of course, with your probation to finish out. "Well, okay," that's what we agreed to, being that it would be adjudicated/withheld as well off my record.

On or about March 10, 2017 the Grievant entered into a plea agreement by the terms of which he pled guilty to the two battery charges[2] and agreed to serve a 30-day jail term in Florida, that would be followed by probation. Under the terms of that "adjudication/withheld" plea agreement, upon serving the 30-day jail term and successful completion of the ensuing probation, Mr. Jenkins' felony conviction record will be expunged from his criminal record.

When Mr. Jenkins returned to Louisville following his acceptance of the plea agreement On March 21, 2017, Jenkins and Local Union Vice-President Jim Clark met with Company Human Resources Manager Barbara Swartz. During that meeting, Jenkins and Clark requested that the Grievant be granted a leave of absence during the term of his upcoming incarceration in Florida. Following that meeting, in a March 22, 2017, email to the Grievant (Company Exhibit 3) Ms. Swartz informed the Grievant and Mr. Clark as follows.

> Allen - as a result of our meeting yesterday, we discussed your request for a personal leave of absence with certain members of the management team. Zeon does not formally offer leaves of absence for personal reasons to employees and all involved believed that the reasons stated would not be acceptable for leave consideration. Because we are unable to grant your request for leave we recognize you will reach 12 points under the Attendance Control Policy thereby reaching a termination status per that policy. Further, your failure to attend work as scheduled may also support separate and independent grounds for termination under the collective bargaining agreement between Zeon and the UFCW. Regards, Barbara

Mr. Jenkins began serving his 30-day sentence in Florida on March 24, 2017, and was released from custody on or about April 24, 2017.

Mr. Jenkins' request to move his previously-scheduled vacation time to the weeks of March 6, 2017, March 20, 2017, and April 10, 2017, was granted by the Company. However, because the weeks beginning March 27, 2017, and April 3, 2017, were already committed to use by other bargaining unit employees Jenkins was not allowed to move his remaining scheduled vacation time to those two weeks. Because he used scheduled vacation to cover his scheduled shifts on March 24, 25 and 26, 2017 Jenkins was not assigned any attendance points for his unexcused absences on those three days.

Mr. Jenkins was charged with an unexcused absence on March 28, 2017. On that same day, he was issued a final written warning because he had accrued 10.5 ACP points as of that date. He was charged with another unexcused absence on March 29, 2017, resulting in in an accrual of 12.5 points under the ACP as of that date, placing him at the Step Four termination stage of the ACP progressive discipline procedure.

In a letter dated April 3, 2017, Human Resources Manager Swartz notified Mr. Jenkins that his employment with the Company was terminated. That letter (Joint Exhibit 2) states in substantive part as below.

---

[2] The third, "Unarmed Burglary of an Unoccupied Dwelling" charge was dropped.

This letter serves as notification of termination of your employment with Zeon Chemicals L.P., as a result of violation of KY Plant Attendance Control Policy effective today's date. Accrual of twelve (12) points under this policy is cause for termination. Due to the reason for your current absence we would prefer you make an appointment should you need to come to Zeon for any business reason after today. We will have one of the Union Stewards box your personal items for return to you. Please inventory those items and let me know as soon as possible if any items are missing so that we may locate them for you.

You will receive benefits information for continuation of coverage per COBRA legislation requirements under separate cover from the benefits department. Expect that information to be sent within the next 10 days. Should you have any questions, please contact me at 502-775-2083.

On April 12, 2017, Local Union President Mac McFall filed a grievance on Mr. Jenkins' behalf. That Grievance (Joint Exhibit 3) states in substantive part as follows.

This grievance is being filed on behalf of Mr. Allen Jenkins. It is the Union's position that Mr. Jenkins was unfairly terminated for attendance. Mr. Jenkins was not extended considerations others have received in the past. Mr. Jenkins conducted himself in an honest and open manner and trusted that after 22 years of dedicated service he be given a leave of absence to deal is his personal issues [sic]. Therefore, the Union requests that his employment be reinstated and that he be made whole for any and all monies he has been shorted due to his termination.

The Grievance progressed through the contractual procedure without resolution and the Parties advanced the Grievance to arbitration before the undersigned in the manner described above.[3]

II. THE ISSUE

At the Parties stipulated the Issue before the Arbitrator to be:

Was the Grievant, Allen Jenkins terminated for just cause? If not, what is the proper remedy?

---

[3] In the Company's April 13, 2017, response to the Grievance (Joint Exhibit 4), Ms. Swartz asserted, *inter alia*, that the Company considered the Union's April 12, 2017, Grievance to be untimely because it was filed more than seven days after the discharge action and more than 21 days after the Union was notified that the Company anticipated that discharge was the likely course of action due to Mr. Jenkins' circumstance. In this arbitration proceeding the Company has not asserted that the Grievance was untimely filed. Therefore, the timeliness contention raised in Ms. Swartz's April 13, 2017, letter to Local Union President McFall will not be considered further.

## III. RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

A. ARTICLE III
Rights of Management

10 Except as otherwise limited in this Agreement, it is mutually understood and agreed that the Company has the right to exercise the regular and customary functions of management including, but not limited to: management of the company, the right to decide the methods and equipment to be used in the direction of the employees, including the right to hire, suspend, promote and demote, discharge and discipline for just cause, to layoff for lack of work or other sufficient reason; to maintain, change, or discontinue operations, processes, products, practices, and work of employees. To determine the hours of work; to promote safety, efficiencies, discipline, order and protection of the Company's employees, operations, property and products from injury; damage or other loss from any source; To determine the suppliers and customers with whom it will deal and the price at which its products will be sold. However, each of the foregoing management prerogatives is subject to any and all other provisions of this agreement and shall not be deemed to overrule any such provisions. This will not be used for the purpose of discrimination against any member of the Union.

The Company and Union agree to give full cooperation in carrying out the functions vested in the Company for the conduct of its business and the efficient management and operation of the plant; to assist in all ways in the elimination of waste, the promotion of efficiencies and economies of operation.

Mandatory direct deposit with no pay advices provided. Employees may access their pay information via the internet.

All employees must provide and maintain a valid and current phone number for management and supervision to use to contact them.

B. ARTICLE IX
Leave of Absence

64 Leaves-of-absence **may** be granted for periods of not over three months, for illness or other casualties and shall be extended when necessary, upon evidence **sufficient to the Employer**, but not to exceed a total of <u>eighteen (18) months</u> (emphasis as in original).

1. To obtain a leave-of-absence the employee must present the Human Resource Department with a Statement of Disability from a Certified Healthcare Provider (See FMLA Policy language) containing the diagnosis of the ailment and a specific time the disability is expected to last.
2. When the request for a leave-of-absence has been made in a timely fashion and properly documented, a leave-of-absence letter will be issued by the Human Resource Department and hand delivered or mailed to the employee's home.

3. Should it be necessary for an employee to extend such leave-of-absence, he will be required to follow the procedure set forth in Paragraph 64.1 prior to the expiration of his current leave-of-absence.

4. An employee who has been away from work for illness or under a doctor's care for four days or longer and released by his physician to return to work must report to the Employer's Medical Director or Company Physician and present a statement from his physician as to his fitness to resume his regular duties.

5. Some medical disabilities require an examination or consultation with the Employer's physician before approval will be granted to return to work. In these situations it is incumbent upon the employee to make arrangements with the Employer's dispensary for such examination/consultation in sufficient time to allow the employee to return to his first scheduled work shift following expiration of his leave-of-absence.

C.  ARTICLE XI
    Grievances and Arbitration

75 Within seven days of the alleged cause, a joint meeting between the Union, the Supervisor and the Department Manager may be requested by the Union. If the grievance is not satisfactorily resolved at such meeting, it may be reduced to writing and referred within seven days of the joint meeting ( or within 14 days of the alleged cause if no joint meeting was conducted) by the department representative to the Supervisor who shall give a written reply within 14 days. If this fails to produce a satisfactory settlement, the matter may be referred to a joint Management/Union meeting. If the grievance is not satisfactorily resolved at the joint Management/Union meeting, the matter may be referred to arbitration. The arbitrator shall be selected from an acceptable list obtained from the Federal Mediation and Conciliation Service or Retired Judges, Mediation and Arbitration, by mutual agreement between the Company and Union. The arbitrator's decision shall be rendered within 30 days from the hearing and shall be final and binding on the parties. All expenses incurred through the use of the impartial arbitrator shall be borne equally by the Union and the Employer.

80 The impartial arbitrator may act on grievances arising over the interpretation or application the provisions of this Agreement but shall neither add to nor subtract from any of the provisions.

D.  ARTICLE XII – Vacations

83 Senior employees are to receive their choice of vacation periods if they so request during the vacation scheduling period and on the vacation scheduling lists in their departments. Vacation scheduling will be started no earlier than October 1 and completed no later than January 31, of the vacation year, and any employee who has not requested a preferred vacation period by that date will be assigned a period by the Employer. No employee, however, will be required to take a vacation in January or February but may do so by choice. These schedules shall remain unchanged except in cases of layoffs or transfer to other vacation groups and except by mutual agreement between the Employer and the employee:

1. An employee curtailed to a new vacation group shall have the option of retaining his present vacation or selecting from those vacation weeks then open and available in his new vacation group.

2. An employee who transfers to a new vacation group, or who returns to a previous vacation group, shall have a choice of only those vacation weeks then open and available. If no vacation weeks are open and available he shall be assigned the vacation period scheduled for him in his last vacation group.

3. An employee and the Employer may mutually agree to change a scheduled vacation. These changes will be permitted, however, only for vacation weeks not filled during the vacation scheduling period.

4. When an employee receives the vacation list they will have a maximum of 4 days to return the list to their supervisor. If they go beyond the 4 day requirement the list shall be forwarded to the next employee on the list.

E.  Zeon Chemicals Kentucky Plant Attendance Control Policy

Excellent attendance is an expectation of all employees of Zeon Chemicals L.P. Daily attendance is especially important for hourly employees who perform continuous-run responsibilities in a 24 hour per day, 7 day per week chemical operation. Employees have a responsibility to their internal and external customers and coworkers who have the expectation of on-time, quality product inventory, shipping and delivery.

Supervision will monitor the attendance of employees in the respective departments. Consideration will be given to the frequency of absence and the reason for absence. All communication regarding the need to be away from work should be made in a timely fashion and to the appropriate level of supervision specified in an employee's work group. "No report" absenteeism is completely unacceptable except in the most extreme circumstances and will be dealt with accordingly.

Punctual, regular and full shift attendance is absolutely essential in achieving efficient and quality production operations and in avoiding unnecessary hardship on those employees who report and work. This attendance policy is established to encourage employees to correct unsatisfactory attendance and to provide consistency in the handling of problems relating to absences.

Zeon will follow a point system to combine the tracking of absences, tardiness and the leaving of shifts early. This policy details how absences and tardiness and leaving the shift early are accounted for and applied.

**DEFINITIONS**

Tardy is defined as clocking into the time recording system 1 minute or later after the start of a scheduled shift. All employees are expected to be in their work area or station by the start of their respective shifts. An individual will be considered tardy if he/she is not in the work area at the start of the shift.

If an employee is tardy more than 1 hour past his regular start time and has not made other arrangements with the shift supervisor, the employee will be counted as a no call/no show and will have 3 points assessed.

<u>Leave Early occurs</u> if an employee leaves the site prior to the end of his scheduled shift. An employee who leaves early will be paid for clock hours worked and will be charged points for leaving early. If the employee receives permission from his/her direct supervisor to leave as EXCUSED, no points will be assessed.

<u>An absence</u> occurs when an employee does not report to work for a scheduled shift. Vacation days, funeral leave, jury duty, military leave, approved bank days, union business, and days approved and designated as Family Medical Leave shall not be assigned points. An absence of 1-7 consecutive days due to the same illness or injury will be counted as one occurrence for the purpose of assigning points IF a physician's note is presented immediately upon return of the employee dated contemporaneously with the missed days. Delayed notes will not be accepted as excused. All other absences will be counted as individual occurrences, even if absences are consecutive.

<u>A no call/no show</u> is a serious matter and is defined as not reporting to work and not calling to report the absence prior to 30 minutes following the start of the shift.

*<u>Saturday absence (For Maintenance Employees Only) - employees who accept voluntary Saturday overtime then fail to fulfill their commitment to the Saturday overtime without an approved excuse by the Supervisor will be assessed 1 point for 3 occurrences.</u>*

DUTY TO NOTIFY (CALL-IN)

In all absentee cases, it is the duty of the employee to notify Zeon Chemicals that they are not available to work their prescribed shift. The employee her/himself (friends and or relatives will not be accepted -other than spouse) must call in and talk to a <u>shift supervisor</u>. (Call-ins from other individuals would be appropriate only in an emergency situation). Calls should be made to the supervisors' cell phone to insure the supervisor is contacted and is aware of the impending absence. If the employee is unable to reach the supervisor on the cell number, a message should be left on the poly supervisor's voice mail; however, it is incumbent upon the employee to ensure that a supervisor is aware of a pending absence.

SPECIAL SERIOUS ABSENCES - NO CALL/NO SHOW:

Not reporting to work and not calling to report the absence within 30 minutes following the start of the shift is a no call/no show and is a serious matter. The first instance of a no call/no show will result in a 3 point assessment. Any no call/no show lasting three consecutive work days is considered job abandonment and will result in immediate termination of employment. A doctor's note cannot be utilized to alleviate the no-call, no show provision, unless for extraordinary circumstances approved by the HR Manager or unless current FMLA rules dictate otherwise.

Management may consider extenuating circumstances when determining discipline for a no call/no show (for instance, if the employee is in a serious accident and is hospitalized) and the Company reserves the right to exercise discretion in such cases.

FAMILY AND MEDICAL LEAVE ACT

Absences due to illnesses or injuries which qualify under the Family and Medical Leave Act (FMLA) will not be counted against an employee's attendance record for the purpose of accruing points. Medical certification documentation within the guidelines of the FMLA and Zeon FML Policy will be required in these instances.

**THE POINT SYSTEM**

Points will be assigned to the attendance issues as follows:

Absence will be charged with 2 points.
Absence with a dated doctor's certification presented on date of return will be charged 1 point.
Tardy will be charged with 1 point
Leaving shift early will be charged with 1 point
No call/no show is 3 points

Points will be tracked on a rolling 12 month calendar. Step discipline will be implemented when accrued points reach pre-determined levels. Occurrences expire twelve months from the date of the incident and the points are deducted. Employees will be allowed 1 visit (documented by a written medical certification) per rolling 12 months to a physician of their choice without being assessed points. If an employee has no unexcused absences in a rolling quarter, the employee will be allowed to have ½ point deducted from their point total. A maximum credit of four points can be banked at any one time.

**STEP ONE**

The accrual of 6 points in any twelve-month period will be the basis for a coaching discussion (verbal warning) between the employee and his/her direct supervisor. The purpose of the coaching session is to make the employee aware that he/she has been absent or tardy frequently enough to draw attention and to be certain that the employee understands this policy and the consequences of the violation. The coaching session will be documented to the employee's personnel file.

**STEP TWO**

The accrual of 8 points in the same twelve-month period will trigger a written warning putting the employee on formal notice of violation as mentioned above.

**STEP THREE**

The accrual of 10 points in the same twelve-month period is cause for a final written warning with a one-day suspension (without pay). This is considered the final warning step in the disciplinary process regarding attendance and punctuality.

The Company, may, at its discretion, impose a 30 day suspension as a final step in the disciplinary process for employees with 20 or more years of service in an effort to impress upon the employee the gravity and severity of the situation.

**STEP FOUR (FINAL)**

The accrual of 12 points in the same twelve-month period is cause for termination of employment.

**PROCEDURES**

**STEP DISCIPLINE - UNSCHEDULED ABSENCES, TARDIES OR LEAVE EARLIES IN A ROLLING TWELVE-MONTH PERIOD.**

**PROCEDURES**

**STEP DISCIPLINE - UNSCHEDULED ABSENCES, TARDIES OR LEAVE EARLIES IN A ROLLING TWELVE-MONTH PERIOD.**

| | |
|---|---|
| **6 points** | **VERBAL WARNING DOCUMENTED TO FILE** |
| **8 points** | **WRITTEN WARNING TO FILE** |
| **10 points** | **FINAL WRITTEN WARNING WITH ONE-DAY SUSPENSION** |
| **12 points** | **TERMINATION OF EMPLOYMENT** |

(emphasis as in original)

IV. <u>POSITION OF THE COMPANY</u>

The Company prefaces its argument by pointing to Paragraph 80 of the Article XI Grievances and Arbitration provision of the Collective Bargaining Agreement, which states as follows:

The impartial arbitrator may act on grievances arising over the interpretation or application of the provisions of this Agreement but shall neither add to nor subtract from any of the provisions.

Next, it, like the Union, the Company asserts that the appropriate quantum of proof standard in this Case is one of a preponderance of the evidence.

As of March 27, 2017, Mr. Jenkins had accrued more than 12 points under the terms of the ACP, a total sufficient to warrant his discharge under the Policy's progressive discipline procedure. For that reason, the Company submits that the only area of dispute here is whether it had any obligation to either grant Jenkins' request for a leave of absence or provide him with a 30-day suspension in lieu of discharge pursuant to Step Three of the ACP.

Regarding the contractual just cause standard for discipline set out in the Article III Rights of Management clause of the Collective Bargaining Agreement, the Company emphasizes that the Arbitrator may not substitute his judgment for that of management. Instead, it avers that the appropriate test here is whether, in consideration of all the relevant facts, the decision to terminate Mr. Jenkins was reasonable.

The Company is convinced that Mr. Jenkins' discharge was justified under the clear terms of the ACP. It notes that when examining discharges for violation of a point-based, no-fault attendance policy like the ACP, arbitrators have held that such policies fully comport with the just cause principle. It observes that most arbitrators agree that no-fault attendance policies should also incorporate the just cause elements of notice, evenhanded treatment and consideration of mitigating factors, while providing for progressive discipline. It submits that because the ACP is well known, consistently enforced and provides for progressive discipline, discharge under its terms should be considered to meet the just cause standard and not be disturbed by the Arbitrator.

The Company believes significant the fact that the ACP is a bargained-for component of the Collective Bargaining Agreement that was not unilaterally implemented by management. It observes that the ACP indisputably calls for progressive discipline and it points out that Mr. Jenkins was subjected to repeated progressive disciplinary steps under the Policy before he was terminated. Specifically, between January 2014 and March 2017 Jenkins received three verbal warnings eight written warnings and three final warnings before he was discharged as a result of having accrued 12.5 attendance points on March 29, 2017. The Company emphasizes that the Grievant did not grieve any of those pre-termination progressive discipline steps.

By the Company's test, Mr. Jenkins' disciplinary and ACP point accrual record demonstrates that he worked the Policy to his advantage over the last three years of his employment. It points out that each time Jenkins approached the 12-point discharge ACP threshold through a consistent pattern of call offs, tardiness and leaving work early his attendance improved and his point total decreased.

The Company maintains that it had complete discretion under the ACP to determine whether Mr. Jenkins should have been suspended for 30 days upon the accrual of more than 12 ACP points on March 29, 2017, instead of being subjected to discharge. It emphasizes that the relevant paragraph of Step Three states: "The company may, at its discretion, impose a 30 day suspension as a final step in the disciplinary process for employees with 20 or more years of service in an effort to impress upon the employee the gravity and severity of the situation."

The Company underscores the fact that nothing in the terms of the ACP or any other factor compels the issuance of a 30-day suspension in lieu of discharge when an employee with 20+ years of employment accrues 12 attendance points. Rather, management is vested with sole discretion as to whether such a suspension is warranted. The Company deems important the omission by the Union and Mr. Jenkins to request that management exercise its discretion to impose a disciplinary penalty short of discharge in Jenkins's circumstance. Regardless, it asserts that the language of Step Three of the ACP is clear and establishes that the issuance of a 30-day suspension in lieu of discharge is a matter left solely to the discretion of management.

In a similar manner, the Company asserts that it was not contractually obligated to grant Mr. Jenkins the leave of absence that he and the Union requested. Management considered that request but ultimately rejected it due to Jenkins's attendance-related disciplinary history, the nature of the charges against him, and the impropriety of granting a leave of absence in the circumstances present in the Grievant's situation. It notes that Paragraph 64 of the Article

IX Leave of Absence provision of the Collective Bargaining Agreement states that "Leaves-of-absence **may** be granted for periods of not over three months, for illness or other casualties and shall be extended when necessary, upon evidence **sufficient to the Employer**, but not to exceed a total of eighteen (18) months" (emphasis as in Article IX).

Incarceration for a criminal offense is not specifically mentioned in Article IX and the Company is convinced that a jail term cannot be deemed to fall under even the penumbra of some other form of leave authorized by Article IX. It maintains that management was under no legal, practical or contractual obligation to grant Mr. Jenkins' request for a leave of absence. The Company opted not to grant the Grievant's request for leave and it insists that in doing so management acted fully consistent with the discretion reserved to it by Article IX. In the Company's view that exercise of discretion by management cannot be said to have constituted an arbitrary, capricious or otherwise discriminatory action.

The Company argues further that there is no past practice that obligated it to grant Mr. Jenkins the leave of absence that he requested; or issue him a 30-day suspension in lieu of discharge. It believes that none of the three prior incidents cited by the Union where bargaining unit employees were granted leaves of absence (Josh Mingus, Bill Crutcher and Ricky Hodge) prove that employees requesting a leave of absence in order to avoid an attendance-related discharge because they were absent from work while incarcerated have ever been granted a leave of absence.

In the final dimension of its argument, the Company dismisses the Union's claim that Mr. Jenkins was the victim of discrimination because of his personal relationship with former management official Heather Hale. It characterizes that claim of discrimination as absurd, citing the fact that Ms. Hale was not working at the Plant during the timeframe in which Jenkins accrued the 12 ACP points that resulted in his discharge.

<u>Conclusion</u>

The Company submits that when the misconduct of an employee violates established policies of the employer, and the stated penalty for such misconduct is discharge, the decision of the employer to discharge the offending employee should be upheld by an arbitrator. Based on the arguments summarized above, the Company takes the position that Mr. Jenkins was discharged for just cause and it asks that the instant Grievance be denied.

V.  <u>POSITION OF THE UNION</u>

The Union asserts that Mr. Jenkins was not terminated for just cause. Like the Company, the Union believes that the appropriate evidentiary standard for the Arbitrator to apply in resolving the stipulated just cause Issue is a preponderance of the evidence. It acknowledges that Jenkins was discharged because he reached the maximum amount of attendance points allowed under the ACP. However, the Union is convinced that the Company misapplied the Policy's terms in the Grievant's case.

The Union believes that the Company improperly ignored the second paragraph of Step Three of the ACP, which grants it the discretion to impose a 30-day suspension as a final, pre-termination step in the Policy's progressive discipline procedure for employees with 20 or more years of service. It avers that the Company offered no convincing explanation as to why it chose not to apply the 30-day suspension contemplated by the second paragraph of Step

Three. The Union contends that the 30-day suspension alternative final pre-termination disciplinary measure is intended to give high seniority employees a second chance in contemplation of their decades of dedicated service to the Company. If Mr. Jenkins had been subjected to a 30-day suspension instead of being terminated, he would have successively served his jail sentence in Florida and been able to keep his job.

The Union further also urges that the Company acted improperly when it refused to grant Mr. Jenkins the leave of absence that he requested so that he could avoid termination. It claims there is no limitation on the type of event that warrants a leave of absence under Paragraph 64 of Article IX of the Collective Bargaining Agreement. Jenkins had never before requested a leave of absence, nor had he previously received a 30-day suspension for attendance. The Union is convinced that that the Grievant was improperly denied his contractual entitlement to either a leave of absence or a 30-day suspension in lieu of discharge.

The Union points out that other similarly situated bargaining unit employees have been granted leaves of absence or 30-day suspensions in lieu of discharge. It notes that the Company granted Jim Clark a leave of absence to be with his sister when she was seriously ill and hospitalized. Brent McNally was granted an extended a leave of absence for bereavement time following the death of a loved one.

The Union takes issue with the Company's apparent belief that it was under no obligation to impose a 30-day suspension on Mr. Jenkins instead of discharging him because neither he nor the Union requested that alternative form of discipline. In the Union's view, the Company's failure to explain why it did not consider the 30-day suspension alternative to termination does not justify that action. It maintains that proper administration of discipline is the Company's responsibility, and the absence of an explicit request for a 30-day suspension from Jenkins or the Union did not justify the discharge of a long-term, valuable employee like Grievant without explanation. In its view, the Company rejected Mr. Jenkins efforts to find a way to avoid discharge, and as a result, he lost his career.

In the final substantive dimension of its argument, the Union claims that the penalty of discharge was not commensurate with the seriousness of Mr. Jenkins' alleged offense. His career ended because of an attendance infraction that he could not avoid. It points to what it submits was a failure by the Company to ascertain the true nature and extent of Jenkins' criminal offense that resulted in a plea bargain whereby he was sentenced to a 30 day jail term in Florida. Given that omission by the Company, coupled with the Grievant's long-term service and demonstrated devotion to Zeon Chemicals, the Union avers that he should have been given the benefit of the negotiated 30-day suspension alternative to termination that he was denied.

<u>Conclusion</u>

Based on the arguments summarized above, the Union takes the position that the termination of Allen Jenkins was not for just cause. For that reason, it asks that the instant Grievance be sustained and that as a remedy, Mr. Jenkins be reinstated to his Relief Operator position and be made whole.

VI. <u>DISCUSSION</u>

Because the instant Grievance concerns a disputed disciplinary action, the Company must bear the burden of proof. The instant Grievance will be denied only if the Company has proven by a preponderance of the evidence that the Grievant, Allen Jenkins was terminated for just cause.

<u>The Nature and Functioning of No-Fault Attendance Policies</u>

The ACP is a typical no-fault attendance policy. No-fault attendance policies seek to simplify the often-perplexing task of monitoring the attendance of bargaining unit employees by creating a general rule that, save a few limited exceptions (e.g. vacation days, bereavement leave jury duty, military leave, approved union business and approved Family and Medical Leave Act leave) absences on scheduled workdays result in employees being charged with attendance points. The ACP, like similar no-fault attendance policies, establishes points thresholds that when reached by an employee automatically trigger a series of progressive discipline actions that can eventually result in the employee's termination.

The touchstones of no-fault attendance policies like the ACP are predictability, consistency and progressive/corrective discipline. There can be no real doubt that the predictable application of the points thresholds for progressive discipline also allows employees who are so inclined to manipulate their points totals in order to maximize the number of days off work they are able to achieve (by calling in sick, reporting absences for personal reasons, "no calls/no shows," etc.) while avoiding termination. Thus, ironically no-fault attendance policies like the ACP can for some employees serve as an implicit license to miss work, as long as they do not exceed the number of absences, tardies, early outs, etc. that would trigger their termination.

Properly implemented, a no-fault attendance policy can satisfy the test of just cause for discipline. At the same time it is important to recognize that the ACP points system at issue here is not a substitute for, and it does not obviate a full and reasonable application of the contractual just cause standard for discipline mutually agreed to by the Parties in Article III of the Collective Bargaining Agreement. A purely mechanical application of the ACP points system, without ensuring that the full range of equitable considerations inherent in the just cause standard are acknowledged and properly weighed in the course of imposing the disciplinary actions triggered by the points system will always be cause for concern.

Significant here is the ACP purpose statement found in its third paragraph. That paragraph states as follows.

Punctual, regular and full shift attendance is absolutely essential in achieving efficient and quality production operations and in avoiding unnecessary hardship on those employees who report and work. This attendance policy is established to encourage employees to correct unsatisfactory attendance and to provide consistency in the handling of problems relating to absences.

The just cause analysis below is informed by the two stated purposes of the ACP: (i) to encourage punctual regular and full shift attendance by bargaining unit employees; and (ii) encouraging employees to correct unsatisfactory attendance, and to provide consistency in the handling of problems relating to absences.

16

Mr. Jenkins' Job Performance and
His Pre-Incarceration Attendance Record

Mr. Jenkins is a long-term employee at the Company's Louisville, Kentucky Rubbertown Plant. He is the senior employee in the Relief Operator classification, which the Parties acknowledge is the most important job in the Plant. The evidence also establishes that Jenkins was a competent Relief Operator.

Prior to 2014, Mr. Jenkins' attendance record was not problematical. However, from 2014 through early 2017 (before the beginning of his incarceration in March and April of that year) Jenkins missed enough work to cause the Company to issue him three verbal warnings (upon the accumulation of six ACP points-six points short of termination), seven written warnings (upon the accumulation of eight ACP points-four points short of termination) and three final warnings (upon the accumulation of 10 ACP points-two points short of termination). The Grievant's absences fell into an identifiable pattern whereby he would miss enough work to place himself within one or two absences of termination, and then attend work with sufficient regularity to lower his ACP points total through the functioning of the Policy's rolling 12-month points forgiveness mechanism.[4] Mr. Jenkins' above-described pattern of absences and arguable manipulation of the points-based ACP progressive discipline procedure sat the stage for his absences from work in March and April 2017 caused by the 30-day jail sentence he served in Florida.

The Just Cause Issue

The routine application of the ACP progressive discipline procedure by the Company triggered Mr. Jenkins termination when his absence from work on March 29, 2017, increased his accrued ACP points total to 12.5 points. Jenkins' ACP points total as of March 29, 2017, establishes *prima facie* proof that his discharge was for just cause. Nevertheless, this finding does not end the just cause inquiry.

Proper application of the Article III just cause standard for discipline in this Case requires a full and thorough assessment of all of the relevant circumstances attendant to Mr. Jenkins absences of March and April 2017. Most particularly, the contractual just cause standard requires the Arbitrator to identify and weigh the significance of each of the aggravating factors and mitigating factors attendant to Jenkins' March-April 2017 absences. Before turning to those matters, the analysis must first address the Company's disputed decision to deny Jenkins' request for a leave of absence pursuant to Article IX of the Collective Bargaining Agreement, and its refusal to allow him to take contractual vacation for the weeks of March 27, 2017 and April 3, 2017.

The Company's Decision to Deny Mr. Jenkins a
Leave of Absence for the Period of His Incarceration

On March 21, 2017, Mr. Jenkins and Union Vice-President Jim Clark met with Human Resources Manager Barbara Swartz at which time they requested that Jenkins be granted a leave of absence to cover the days of work he would miss due his impending incarceration in Florida. On the next day, March 22, 2017, Ms. Swartz informed the Grievant that the Company considered

---

[4] There is no evidence in the hearing record to establish the reasons for Mr. Jenkins various absences from 2014 through early 2017. However, it is significant that he did not grieve any of the verbal warnings, written warnings or final warnings prompted by those absences.

the reasons for his impending absences (i.e., serving jail time for a felony battery conviction) not to be an appropriate basis for granting a leave of absence.

The Union maintains that the Company's refusal to grant Mr. Jenkins a leave of absence during the period of his incarceration was improper because there is no limitation in the Article IX, Paragraph 64 leaves of absence provision that restricts the reasons for which an employee may be granted a leave of absence. It urges further that the Company has granted leaves of absence to other bargaining unit employees under circumstances similar to those encountered by Jenkins in March-April 2017. Those contentions are not persuasive.

The first sentence of Paragraph 64 states "Leaves of absence **may** be granted for periods of not over three months, for illness or other casualties and shall be extended when necessary, upon evidence **sufficient to the Employer,** but not to exceed a total of eighteen (18) months**"** (emphasis as in Paragraph 64). That initial sentence and the remainder of Paragraph 64 speak in narrow terms that clearly indicate that the focus of the leaves of absence contemplated by that Paragraph is absences caused by medical disabilities that must be documented by a FMLA Statement of Disability from a Certified Healthcare Provider. The only other reasons for a leave of absence specifically articulated in Article IX are found in the Paragraph 65 and 66 references to Union-related activities.

The fact that the Company in the past apparently granted leaves of absence to two bargaining unit employees – one to Jim Clark so that he could be with his gravely ill sister, and a second to Brent McNally for an extended bereavement leave following the death of a loved one – do not establish that the Company was contractually obligated to grant Mr. Jenkins a leave of absence pursuant to Article IX. Those two prior instances of non-medical related leaves of absence are substantially different from the circumstance faced by Mr. Jenkins in March-April 2017. Whatever the events may have been that led to his guilty plea and resultant 30-day jail term, nothing in the language of Article IX or the two non-medical leaves of absence previously granted other bargaining unit employees establishes that the Company violated Article IX when it exercised its discretion and chose not to grant Jenkins a leave of absence during the term of his incarceration in Florida.

<u>The Company's Refusal to Allow Mr. Jenkins to Switch His Previously</u>
<u>Scheduled Vacation to the Weeks of March 27 and April 3, 2017</u>

The evidence in hearing record establishes that the Company routinely permits bargaining unit employees to switch their previously scheduled vacation weeks to alternate weeks, provided the alternate vacation weeks the employee seeks do not conflict with the scheduled vacation weeks of other employees. Thus, because other bargaining unit employees had already scheduled vacation during the weeks of March 27, 2017 and April 3, 2017, the Company refused to grant Mr. Jenkins' request that he be allowed to switch his remaining vacation entitlement to those two weeks.

The Company was under no contractual or past practice-based obligation to allow Mr. Jenkins to switch his two remaining vacation weeks to the weeks of March 27 and April 3. Its actions were consistent with the manner in which the scheduling and rescheduling of bargaining unit employee vacations has been handled over the years. It is true that because Jenkins was going to be absent during those two weeks regardless of whether the Company approved the vacation weeks switch he requested, granting his request would have had no impact on staffing at the Louisville Rubbertown Plan. Nevertheless, the Company cannot be called to task for its somewhat wooden

18

application of the established vacation scheduling past practice in the Grievant's Case. Its actions did not result in a violation of the Collective Bargaining Agreement.

The Aggravating Factors Attendant to
Mr. Jenkins' Absences of March-April 2017

The first aggravating factor pertinent to this controversy is the fact that for some three years before he finally passed the 12-points termination threshold under the ACP progressive discipline procedure, Mr. Jenkins had undoubtedly manipulated that points system in order to avoid termination while often maximizing the number of days he missed work. Whatever the reasons may have been for that negative turn in Jenkins' attendance record from 1974 forward, the fact remains that he was fully aware of the terms of the ACP and knew that reaching the 12 ACP points total threshold would result in his termination.

A second aggravating factor in Mr. Jenkins's Case was his conviction for felony criminal battery that resulted from his involvement in the July 2015 Florida altercation between his father and his father's neighbor. In the Company's view, that felony conviction – the result of the plea agreement entered into by Jenkins in early March 2017 - was so serious a crime as to preclude any special consideration with regard to the attendance points generated during the term of his incarceration.

When viewed in the abstract, both of these aggravating circumstances serve to exacerbate the gravity of Mr. Jenkins' absence from work during his March-April 2017 incarceration in Florida. It is clear that the Company determined that in combination those circumstances made unnecessary any further consideration of any alternatives to the termination penalty indicated by Jenkins' accrual of 12 ACP points on March 29, 2017. In the analysis that follows, those aggravating factors will be weighed and balanced against the mitigating factors pertinent to the Grievant's absences during March and April 2017 that led to his discharge.

The Mitigating Factors Attendant to
Mr. Jenkins' Absences of March-April 2017

At this point, the Parties' mutual intent memorialized in the Collective Bargaining Agreement, that the ACP "is established to encourage employees to correct unsatisfactory attendance and to provide consistency in the handling of problems relating to absences" becomes paramount. Important here is the fact that even if Mr. Jenkins had achieved a perfect, zero-points ACP total as of the March 24, 2017, beginning of his incarceration in Florida, a straight-out application of the ACP discipline sequence would have resulted in his termination on or about April 6, 2017. Thus, the true reason for his discharge becomes apparent.

Mr. Jenkins was terminated because he entered into a plea agreement resulting from the altercation between him and his father's neighbor on July 15, 2015. The evidence in the hearing record establishes that upon learning of Jenkins' plea agreement on March 21, 2017, the Company made no further inquiry regarding the circumstances that led to him being charged with having committed a criminal act of felony battery on July 15, 2017. The Company did not explain its failure to investigate the events that led to that guilty plea. Instead, it summarily concluded that because the Grievant had pled guilty to "assaulting an elderly couple," no further inquiry was required. This is the first, and a significant mitigating factor.

At the time of his termination, Mr. Jenkins had worked for the Company for some 22 years. The evidence in the hearing record indicates that Jenkins was a competent Relief Operator, albeit one with a less than satisfactory attendance record from 2014 through early 2017. Save those attendance-related problems, the Grievant had never been called to task for his work performance and there is no evidence that before July 15, 2015, he had ever committed a criminal act or been charged with same. In the Company's view, the fact that the July 15, 2015, incident was his first encounter with the criminal justice system, and that the incident involved behavior away from the workplace was of no significance.

At the hearing, Mr. Jenkins described the circumstances that arose on July 15, 2015, that eventually led to his discharge (Transcript, page 153 line 4 to page 156, line 1). On cross-examination, the Company did not challenge Jenkins' account in any substantive matter and it offered no alternative version of the facts in its case-in-chief. Jenkins' demeanor at the hearing demonstrated him to be a credible witness. He answered difficult questions forthrightly and did not vacillate or equivocate on cross-examination. Given that fact and in the absence of any probative evidence in the hearing record calling Jenkins' account of the events July 15, 2015 into question, the Arbitrator is obliged Arbitrator to accept his version of what transpired on that date as true.

In sum, Mr. Jenkins told a story that described how, after he returned from playing miniature golf and visiting a local marina with his two daughters, his drunken alcoholic father had gotten into an argument with a neighbor and subsequently compelled him to join the imbroglio. The argument had arisen because his father's neighbor had kept a grinder owned by the senior Jenkins for over a year. At his father's behest, Jenkins went to the neighbor's house to defend his dad and retrieve the grinder. The Grievant stated that his father's neighbor was not aged, and was a "big guy," standing "six-five or six-six."

Upon arriving at the neighbor's house, Mr. Jenkins asked the neighbor for the grinder and after an exchange of "bad words" between the two men, the neighbor came out and threw the grinder at him. Jenkins deflected the grinder and again started saying bad words to the neighbor. When he bent down to pick up the grinder the neighbor struck him in the face, giving him a bloody lip.

Mr. Jenkins testified that at that point he pulled out a (camera) selfie stick (presumably from his pocket) he had used earlier with his daughters and started hitting the neighbor with the stick to get him away from him. At this point, the neighbor's wife intervened, yelling "Stop" whereupon her husband ran into his garage and grabbed a crowbar, came out of the garage and began hitting Jenkins with the crowbar. At this juncture, the Grievant grabbed his father's grinder and took off for his father's house.

When Mr. Jenkins returned to his father's house, he called 911. The neighbor also called 911. When the police arrived and spoke with Jenkins, they asked him if he wanted to press charges. He recalled that he responded by saying "no, we both hit each other." The neighbor did press charges against Mr. Jenkins, resulting in the Grievant being initially charged with both felony battery and burglary of an unoccupied dwelling.

Nothing further transpired until Mr. Jenkins was sentenced, on about March 10, 2017. On that day, Jenkins chose to accept a plea bargain, pleading guilty to felony battery in exchange for a 30-day jail sentence. The Grievant testified that he was told in court that his sentence would be an "adjudicated/withheld" sentence and that once he finished his jail term and successfully

completed post-incarceration probation, his criminal record would be expunged. He recalled further that at the sentencing the judge told him that he could serve his sentence through home incarceration and continue to work at his job. Because the Grievant lives and works in Louisville, Kentucky, home incarceration was not feasible.

There is no indication in the hearing record that the Company was aware of any of the above-described details of the July 15, 2015, incident that led to Mr. Jenkins arrest and his subsequent guilty plea via a plea bargain. It described his crime as assaulting an elderly couple and apparently proceeded from a mindset as articulated by Company Counsel at the hearing, *to wit*: "He was charged with a crime, he pled out, pled guilty as charged and spent time in jail" (Transcript, page 25, lines 5-6). Because that time spent in jail resulted in Jenkins accruing more than 12 ACP points, the Company determined there was just cause for his termination.

The substantive due process element of the contractual just cause standard contemplates that in this type of highly unusual situation, before terminating an employee under the ACP, the Company will fully investigate the circumstances that led to the employee exceeding the 12 points total termination threshold of the Policy's progressive discipline procedure. This is especially imperative when the precipitating absences of an employee are due to off-duty misconduct that involves a felony criminal offense indicating moral turpitude on the employee's part. The Company's choosing not to investigate the events of July 15, 2015, that eventually resulted in Mr. Jenkins being absent from the workplace from March 25, 2017, forward was a serious omission on its part that abridged Jenkins' contractual right to substantive due process. It is a significant mitigating factor.

The final consideration relevant to a determination of whether Mr. Jenkins was terminated for just cause is an assessment of the Company's decision not to impose a 30-day suspension in lieu of discharge. Step Three of the ACP memorializes the Parties' mutual intent that the Company may, where justified, impose a 30-day suspension as a final step in the disciplinary process for employees with 20 or more years of service, in order to impress upon the employee the gravity and severity of the situation.

The Company submits that the decision whether to utilize the 30-day suspension alternative to termination in Mr. Jenkins' Case was a matter solely within its discretion. That is true; presuming that the Company had a rational, reasonable basis for choosing not to exercise the discretion granted it by Step Three of the ACP progressive discipline policy. The Company's sole articulated explanation for its determination that a 30-day suspension in lieu of discharge was not appropriate in Jenkins' Case was the fact that neither he nor his Union representative requested a 30-day suspension in lieu of discharge. Thus, the Company effectively maintains that if an employee with 20 or more years of service does not request that he be suspended for 30 days instead of being discharged, it is under no obligation to consider that alternative. The Arbitrator does not agree.

Application of the terms of the ACP, including whether a 30-day suspension as an alternative to termination is warranted for a 20+ year employee who accrues 12 or more ACP points is the responsibility of the Company. The apparent omission by Mr. Jenkins and the Union to request that option be employed does not somehow relieve the Company of its duty pursuant to the contractual just cause standard to fully and fairly consider whether a 30-day suspension was justified in Jenkins' case. The Company's apparent determination that it was not necessary to consider the 30-day suspension alternative precluded it from objectively assessing whether the full range of circumstances surrounding the incident of July 15, 2015, justified that suspension in lieu of discharge. That is a matter of serious concern and constitutes another mitigating factor.

Proper implementation of the contractual just cause standard for discipline further obliged the Company to objectively determine if the following additional mitigating factors surrounding Mr. Jenkins' felony battery conviction and March-April 2017 absences from work that resulted from his plea bargain agreement indicated that termination was not an appropriate penalty that would serve the corrective discipline objective of the ACP.

1. First, Jenkins' unrebutted hearing testimony reveals that the incident of July 15, 2015, which led to his arrest and subsequent guilty plea was not of his making. He became entangled in the dispute between his father and his father's neighbor at the urging of his father, who was in an intoxicated state. The Grievant walked to the neighbor's house to defend his father and retrieve his father's grinder, not to start a fight with the neighbor.
2. The only blows landed by the Grievant on his father's neighbor were struck by a camera selfie stick, in an effort to prevent any further attempt by the neighbor to continue striking him.
3. In the second episode of the subject incident, the neighbor struck Mr. Jenkins with a crowbar.
4. In response, Mr. Jenkins did not strike the neighbor again with the camera selfie stick and he did not attempt to land any blows with his fists. Instead, he picked up his father's grinder and departed the scene.

The above-described series of events does not paint a picture of the typical felony battery scenario. It is true that Mr. Jenkins committed an act of battery when he struck the neighbor several times with a camera selfie stick in an effort to defend himself. It is also true that instead of running the risk of undergoing a jury trial that he feared might result in a jail sentence of more than the agreed upon plea bargain jail term of 30 days, Jenkins chose to plead guilty to the charge of felony battery. Nevertheless, the Grievant's undisputed version of the events that led to his guilty plea significantly reduces the momentousness of that felony conviction. There is a substantial difference between an unprovoked act of battering an elderly couple and defending yourself against an attack by a man much larger than you are who strikes you in the face and then hits you with a crowbar.

The full range of the terms of the plea bargain arrangement offered Mr. Jenkins by the sentencing judge further illuminate the fact that the sentencing judge did not consider Jenkins' offense to be a major crime. The Grievant testified, again without challenge that the sentencing judge offered him the option of serving his jail sentence via a house arrest, which would have allowed him to continue to report to work if he had lived in the Florida community where his offense occurred. That option, which would have enabled the Grievant to avoid termination under the ACP, was not a viable one in Mr. Jenkins' Case because he lived and worked in Louisville, Kentucky.

The Company's incurious attitude regarding the full range of circumstances attendant to the events of July 15, 2015, and the details of the subsequent plea agreement entered into by Mr. Jenkins is most troubling. Jenkins' accrual of more than 12 attendance points under the ACP may well have justified his termination. However, the substantive due process guarantee integral to the contractual just cause provision and Step Three of the ACP required that before terminating the Grievant, the Company make a full, fair and informed determination of whether exercise of its discretion to impose a 30-day suspension in lieu of termination was justified.

The preponderance of the evidence establishes that the Company failed to satisfy that obligation and instead relied upon a mechanical application of the ACP progressive discipline policy that considered few, if any facts beyond Mr. Jenkins' guilty plea and his accrual of 12 attendance points as of March 29, 2017. At the same time, the Company's actions left Jenkins, who had 8.5 attendance points as of March 26, 2017, with no opportunity to correct his attendance shortcomings after he received a final written warning on March 28, 2017. His termination was a *fait accompli* because at that point, he was in jail in Florida and could nothing to stop his attendance points total from exceeding 12 points, which it did on March 29, 2017.

The Company correctly asserts that the granting of a 30-day suspension in lieu of discharge for an employee with 20 or more years of service is a matter that lies within its discretion. However, its failure to make a fully informed, objective decision as to whether Mr. Jenkins' predicament in March-April 2017 warranted exercise of that discretion is another matter. That omission, in conjunction with the full range of mitigating factors attendant to Jenkins' predicament in March-April 2017 vitiates the Company's claim that the Grievant's termination was for just cause.

Conclusion

The preponderance of the evidence in the hearing record recounted in the analysis above indicates that Mr. Jenkins is an individual who, if he is permitted to return to work, will take advantage of the opportunity to prove that he is worthy of retention by the Company. His demeanor on the witness stand at the hearing and his many years of satisfactory service suggest further that he is worthy of a final opportunity to rehabilitate himself by correcting the chronic pre-termination absenteeism issues that propelled the Company to conclude that a perfunctory application of the ACP progressive discipline procedure was appropriate.

The Arbitrator has carefully considered all of the relevant facts and balanced the aggravating factors and mitigating factors present in this controversy. Having done so, the undersigned finds that the Company's failure to investigate fully and dispassionately assess the full range of circumstances that led to Mr. Jenkins' accrual of 12 ACP points on March 29, 2017, fell short of the type of effort contemplated by the contractual just cause standard and its constituent substantive due process guarantee. For that reason, in the Award below the undersigned will sustain the instant grievance.

VII. <u>AWARD</u>

The Company has failed to prove by a preponderance of the evidence that the Grievant, Allen Jenkins was terminated for just cause. Accordingly, the instant Grievance is sustained.

As a remedy, the Company is directed to reinstate Mr. Jenkins to the Relief Operator position that he held at the time of his April 3, 2017, termination. The Company is further directed to remove the April 3, 2017, termination letter from Jenkins' employment record and substitute therefore a 30-day suspension pursuant to Step Three of the ACP and set his ACP points total at the 8.5 points level that he had accrued as of March 27, 2017. Upon, and only upon  his return to work the Grievant is to be made whole for the straight-time wages he would have earned had he not been terminated – from May 1, 2017, up to the date he returns to work, less the 30 days of straight-time wages accounted for by the above-directed 30-day suspension. No interest is to be paid on the backpay award. No further remedy is directed.

In order to ensure a full and expeditious implementation of the remedy just directed, the Arbitrator will retain jurisdiction over this Matter for a brief period, solely with regard to the implementation of the remedy directed herein. If the Arbitrator is not notified by one or both of the Parties that a controversy exists regarding the interpretation and implementation of the remedy directed in this Award by or before 5:00 p.m. EDT on Monday June 25, 2018, his jurisdiction over this Matter will end.

Bloomington, Indiana
April 27, 2018                                      Stephen L. Hayford, Arbitrator