UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00376-GNS

ZEON CHEMICALS, L.P.                                                        PLAINTIFF

v.

UNITED FOOD AND
COMMERCIAL WORKS, LOCAL 72D                                        DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the parties' dueling motions for summary judgment. (DN 17, 18). The motions are ripe for decision. For the reasons provided below Plaintiff's motion is **GRANTED**.

**I.     BACKGROUND**

This case arises under Section 301 of the Labor Management Relations Act ("LMRA") concerning a dispute between Plaintiff Zeon Chemicals, L.P. ("the Company") and Defendant United Food and Commercial Works, Local 72D ("the Union") over a decision rendered by Arbitrator Stephen Hayford ("the Arbitrator"). (Compl. ¶ 1, DN 1). The Arbitrator concluded that the Company did not terminate its employee, Allen Jenkins ("Jenkins"), for just cause as required under the terms of the collective bargaining agreement ("CBA") between the Company and the Union. (Compl. Ex. B, at 24, DN 1-3 [hereinafter Arbitration Award]).

In late March or early April 2017, Jenkins was visiting his family in Florida and was involved in an altercation with his parents' neighbor. (Arbitration Hr'g Tr. 153:4-8, DN 18-2 [hereinafter Tr.]). After the neighbor pressed charges, Jenkins was arrested and pleaded guilty to a charge of felony assault. (Tr. 155:25-156:1, 167:13-23). Jenkins was given a couple weeks to get his affairs in order before reporting for his thirty-day jail sentence. (Tr. 167:13-23). At that time, Jenkins knew "it was going to be a risk" he would lose his job as a result of this impending thirty-day sentence in light of the Company's Attendance Control Policy ("ACP") articulated in the CBA. (Tr. 168:11-17).

The ACP provides that the Company "will follow a point system to combine the tracking of absences, tardiness and the leaving of shifts early." (Compl. Ex. A, at 51, DN 1-2 [hereinafter CBA]). The ACP assigns points for attendance issues which accumulate on a rolling twelve-month calendar. (CBA 51-53). An "absence" is defined as a failure to report to work for a scheduled shift, with exceptions for vacation, funeral leave, and FMLA leave, among others. (CBA 51). Each absence is counted as an individual occurrence, even if consecutive, and each is charged with two points. (CBA 51-52).

The ACP features a four-step procedure directing the Company's responses in the event an employee accrues certain numbers of points in a given year:

> **STEP ONE**
> The accrual of 6 points in any twelve-month period will be the basis for a coaching discussion (verbal warning) between the employee and his/her direct supervisor. The purpose of the coaching session is to make the employee aware that he/she has been absent or tardy frequently enough to draw attention to be certain that the employee understands this policy and the consequences of the violation. The coaching session will be documented to the employee's personnel file.
>
> **STEP TWO**
> The accrual of 8 points in the same twelve-month period will trigger a written warning putting the employee on formal notice of violations as mentioned above.

2

**STEP THREE**
The accrual of 10 points in the same twelve-month period is cause for a final written warning with a one-day suspension (without pay). This is considered the final warning step in the disciplinary process regarding attendance and punctuality.

The Company, may, at its discretion, impose a 30 day suspension as a final step in the disciplinary process for employees with 20 or more years of service in an effort to impress upon the employee the gravity and severity of the situation.

**STEP FOUR (FINAL)**
The accrual of 12 points in the same twelve-month period is cause for termination of employment.

(CBA 53).

At the time he was to begin his sentence for the felony assault conviction, Jenkins had accrued 8.5 attendance points. (Tr. 77:2-15). Jenkins was permitted to use some accumulated vacation days to cover a part of his absence, but accumulated more than 12 points under the ACP while serving his sentence in Florida and was subsequently terminated from employment with the Company, effective March 29, 2017. (Tr. 77:12-19, 80:20-81:20; Pl.'s Mot. Summ. J. Ex. B, at 154, DN 18-3 [hereinafter Arbitration R.]).

On April 12, 2017, the Union filed a grievance on Jenkins' behalf alleging that he was unfairly terminated for attendance.[1] (Arbitration R. 155). Referring to the discretionary suspension, the Union alleged that "[a]s a result of his personal relationship with former plant management[,] Mr. Jenkins was not extended considerations others have received in the past." (Arbitration R. 155). The Union said that Jenkins "trusted that after 22 years of dedicated service he be given a leave of absence to deal [with] his personal issues." (Arbitration R. 155).

---

[1] The Company did not provide a 30-day suspension because Jenkins did not request it. (Tr. 81:11-20).

The Arbitrator considered the language of the ACP in conjunction with other provisions of the CBA. (Compl. Ex. B, at 2-12, DN 1-3 [hereinafter Arbitration Award]). Article III, titled, "Rights of Management," provides in relevant part:

> Except as otherwise limited in this Agreement, it is mutually understood and agreed that the company has the right to exercise the regular and customary functions of management including, but not limited to: management of the company, the right to decide the methods and equipment to be used in the direction of the employees, including the right to hire, suspend, promote and demote, discharge and discipline for just cause, to layoff for lack of work or other sufficient reason; to maintain, change, or discontinue operations, processes, products, practices, and work of employees.

(CBA 7). Further, Article IX of the CBA, titled "Leave of Absence" provides:

> Leaves-of-absences **may** be granted for periods of not over three months, for illness or other casualties and shall be extended when necessary, upon evidence **sufficient to the Employer**, but not to exceed a total of eighteen (18) months.

(CBA 15). Article IX also provides instructions for employees to obtain leaves-of-absence. It includes steps for returning to work and for examinations required to return in the case of certain disabilities. (CBA 15). Jenkins did request and was denied a 30-day leave of absence under Article IX of the CBA. (Tr. 81:8-10).

Upon review of the CBA and the facts underlying Jenkins' dispute with the Company, the Arbitrator concluded that "[t]he Company ha[d] failed to prove by a preponderance of the evidence that the Grievant[] . . . was terminated for just cause" and sustained the grievance. (Arbitration Award 24). In reaching this conclusion, the Arbitrator noted that the grievance could be denied only if the Company failed to bear its burden of proof that Jenkins was fired for just cause. (Arbitration Award 16). The Arbitrator opined that while "a no-fault attendance policy can satisfy the test of just cause for discipline[,] [a]t the same time it is important to recognize that the ACP points system at issue here is not a substitute for, and it does not obviate a full and reasonable application of the contractual just cause standard for discipline mutually agreed to by the Parties

4

in Article III of the [CBA]." (Arbitration Award 16). Although Jenkins' accumulation of points in violation of the ACP established "*prima facie* proof that his discharge was for just cause," that was not the end of the inquiry. (Arbitration Award 17). Instead, the Arbitrator considered all of the relevant circumstances surrounding Jenkins' absences during the relevant period in light of the stated purpose of the ACP "to encourage employees to correct unsatisfactory attendance and provide consistency in the handling of problems relating to absences." (Arbitration Award 17; CBA 51).

The Arbitrator first determined that the Company was not contractually obligated under Article IX of the CBA to provide Jenkins a leave of absence because prior instances when the Company granted such leave—for an employee to care for his gravely ill sister and for another's extended bereavement following the death of a loved one—were substantially different than Jenkins' situation. (Arbitration Award 18). Further, the Arbitrator determined the Company was under no obligation to permit Jenkins to switch his remaining, unused vacation time to the period of his incarceration which was "consistent with the manner in which the scheduling and rescheduling of bargaining unit employee vacations ha[d] been handled over the years." (Arbitration Award 18).

Next, the Arbitrator considered whether the Company discharged Jenkins for just cause, as set forth in Article III of the CBA, when it fired Jenkins under the ACP. The Arbitrator reasoned, "[m]ost particularly, the contractual just cause standard require[d] [him] to identify and weigh the significance of each of the aggravating factors and mitigating factors attendant to Jenkins' March-April 2017 absences." (Arbitration Award 17). The Arbitrator found aggravating factors where the record demonstrated Jenkins "undoubtedly manipulated [the ACP] in order to avoid termination while often maximizing the number of days he missed work." (Arbitration Award

5

19). Another aggravating factor was that the reason for his absence was a felony battery conviction. (Arbitration Award 19).

As mitigating factors, the Arbitrator considered that after Jenkins entered his plea agreement in Florida, "the Company made no further inquiry regarding the circumstances that led to him being charged with having committed a criminal act of felony battery . . . ." (Arbitration Award 19). Because the Company did not investigate the circumstances surrounding Jenkins' off-duty conduct which caused his absences, the Company "abridged Jenkins' contractual right to substantive due process[,]" which was considered a significant mitigating factor. (Arbitration Award 21). According to the Arbitrator, the Company had a "duty pursuant to the contractual just cause standard to fully and fairly consider whether a 30-day suspension was justified" in Jenkins' case, but its failure to consider that alternative "precluded it from objectively assessing whether the full range of circumstances surrounding the incident . . . justified that suspension in lieu of discharge." (Arbitration Award 21).

The Arbitrator concluded:

> Jenkins' accrual of more than 12 attendance points under the ACP may well have justified his termination. However, the substantive due process guarantee integral to the contractual just cause provision and Step Three of the ACP required that before terminating the Grievant, the company make a full, fair and informed determination of whether exercise of its discretion to impose a 30-day suspension in lieu of termination was justified.

(Arbitration Award 22). Because the Company failed to engage in this deliberation, the Arbitrator ruled in favor of Jenkins and ordered the Company to reinstate him to his old job. (Arbitration Award 24).

The Company filed its Complaint to vacate the Arbitrator's Award on June 12, 2018. (Compl. 21, DN 1). In moving for summary judgment, the Company argues that the Arbitrator ignored the express terms of the CBA and imposed additional requirements outside its agreement

6

with the Union "based entirely on the Arbitrator's personal considerations of equity and fairness . . . ." (Pl.'s Mem. Supp. Mot. Summ. J. 5, DN 18-1 [hereinafter Pl.'s Mem.]). The Union also moves for summary judgment, contending that the Company's arguments amount to a "mere disagreement" with the Arbitrator's conclusions and are therefore insufficient to overrule his decision. (Def.'s Mem. Supp. Mot. Summ. J. 5, DN 17-1 [hereinafter Def.'s Mem.]).

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 185(c).

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

Federal courts deciding issues under Section 301 of the LMRA base their review of arbitrators' findings on three cases decided by the U.S. Supreme Court known as the *Steelworkers* Trilogy.[2] Those cases establish that reviewing courts are deferential to the findings and conclusions of arbitrators. *Enter. Wheel & Car Corp.*, 363 U.S. at 596. "It is the arbitrator's construction which was bargained for [in the CBA]; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id*. at 599.

Judicial review of arbitration awards is "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am., AFL-CIO, Dist. 27, Sub-Dist. 5*, 913 F.2d 1166, 1169 (6th Cir. 1990). An arbitrator's authority is not unfettered, however, and the *Steelworkers* Trilogy gave lower federal courts the power to refuse to enforce an arbitration award where it fails to "draw[] its essence from the [CBA]." *Enter. Wheel & Car Corp.*, 363 U.S. at 597.

---

[2] The trilogy is comprised of: *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 565 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960). *See Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 900 (6th Cir. 2012).

8

In *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987), the Supreme Court "reminded litigants that the courts have a 'limited role' when the losing party to an arbitration seeks judicial intervention." *Mich. Family Res., Inc. v. Serv. Emp. Int'l Union Local 517M*, 475 F.3d 746, 751-52 (6th Cir. 2007) (citing *Misco*, 484 U.S. at 36). Reviewing courts thus retain the authority to review whether the arbitration award was issued "out of a legitimate process . . . ." *Id.* at 752. Such considerations include: (i) whether the CBA committed the dispute to arbitration, (ii) the prevailing party procured the decision through fraud, (iii) the arbitrator suffered from a conflict of interest or was dishonest in reaching his decision, and (iv) whether the award merely reflects "the arbitrator's own notions of industrial justice" where the arbitrator is not "even arguably construing or applying the contract and acting within the scope of his authority . . . ." *Misco*, 484 U.S. at 38.

In *Michigan Family*, the Sixth Circuit referenced the Supreme Court's conclusions in *Misco*, but emphasized that "only the most egregious awards [would] be vacated" under the "arguably construing" standard. *Mich. Family*, 475 F.3d at 753. If the arbitrator appeared to be engaged in interpreting the CBA, a court's inquiry ends. *Id.* "With the window so narrowed, a court may vacate an award only in the 'rare exception' when the arbitrator was 'so ignorant of the [CBA]'s plain language' that 'any contention that the arbitrator was construing the contract' is 'implausible.'" *United Transp.*, 700 F.3d at 901-02 (quoting *Mich. Family*, 475 F.3d at 753). Thus, an arbitrator's award fails the "arguably construing" inquiry only when the arbitrator's decision was "so untethered to" the CBA under consideration that he enters "the forbidden world of effectively dispensing his own brand of industrial justice." *Id.* at 902 (internal quotation marks omitted) (citation omitted). "Put otherwise, if the arbitrator's construction is plausible, it must not be disturbed." *Id.*

9

In *International Brotherhood of Electrical Workers, Local 175 v. Thomas & Betts Corp.*, 182 F.3d 469 (6th Cir. 1999), the Sixth Circuit held that an arbitrator disregarded the terms of the CBA by adding a requirement that the company could not unreasonably fail to excuse an employee's absence, despite the CBA's clear prohibition against the addition of contract terms by the arbitrator. *Thomas & Betts*, 182 F.3d at 472. The CBA provision there allowed automatic termination for employees violating the terms of a leave of absence, failing to return upon completing an authorized leave, or being absent for three or more consecutive work days without notice and without an acceptable excuse. *Id.* at 471. The employee failed to notify his employer about a surgical procedure and was terminated. *Id.* The arbitrator ruled in favor of the employee, reasoning that he was preoccupied with the contemplated surgery. *Id.* The arbitrator stated, "[t]his is not a case in equity, but the labor agreement is not clear on notice requirements for an employee off work due to an on-the-job injury. *Thus, some interpolation of contract terms is permissible*." *Id*. With this, the arbitrator concluded that "[t]he contract as so applied, permits finding that the company unreasonably withheld excusing the grievant's absence from work . . . ." *Id*.

Upon reviewing the arbitrator's award and the language of the CBA, the Sixth Circuit noted that "[w]hen a [CBA] prohibits the addition of contract terms, the arbitrator may not proceed to do so." *Id*. at 472 (citation omitted). The arbitrator "'interpolat[ed] . . . contract terms,' i.e., imposed additional requirements, which were not written in the agreement[,]" and thus imposed upon the company a requirement that it "may not unreasonably withhold excusing an employee's absence," which entirely disregarded the language of the CBA. *Id*. (first alteration in original) (citing *Misco*, 484 U.S. at 38). "Because the arbitrator's award d[id] not take its essence from the [CBA]" the Sixth Circuit found that the arbitrator "was not even arguably construing" the CBA. *Id*.

In the present case, while the Arbitrator quotes the CBA, he nevertheless ruled in a manner which appears to be completely untethered to the language of the CBA. *Mich. Family*, 475 F.3d at 753. The Arbitrator repeatedly cited "substantive due process" with regard to Jenkins' rights under the CBA, particularly referring to Article III's inclusion of "just cause" in the language providing that "[e]xcept as otherwise limited in [the CBA], it is . . . agreed that the company has the right to exercise the regular and customary functions of management including . . . the right to hire, suspend, promote and demote, discharge and discipline [employees] for just cause . . . ." (Arbitration Award 21, 22; CBA 7).

While the right to *enter* contracts has been recognized as protected by the Fourteenth Amendment, neither Defendants nor the Arbitrator provide citation to any case where substantive due process has been employed as a method of contract interpretation or construction. In its usual context, substantive due process refers to a principle of constitutional interpretation through which courts have protected certain rights from government interference, though not expressly provided for in the text of the Constitution, by utilizing the Due Process Clause of the Fourteenth Amendment in conjunction with the Bill of Rights. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 167 (1973) (Stewart, J., concurring) (holding Texas criminal abortion statutes prohibiting abortions at all stages of pregnancy except to save the mother's life violated women's substantive due process rights); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (holding that Virginia's anti-miscegenation laws violated due process rights because the laws interfered with the right to marry). There is no question here of any governmental action whatsoever: this case simply involves construction of a contract between two private parties. With this, it appears that the Arbitrator was not engaged in legitimate interpretation of the CBA, but referenced substantive due process solely to "dispense his own brand of industrial justice[]" in contravention of the explicit terms of the CBA. *United*

*Transp.*, 700 F.3d at 902 (citation omitted); *see Mich. Family*, 475 F.3d at 753. By employing the "interpolative reasoning underlying substantive due process," the Arbitrator effectively imposed upon the Company additional requirements found nowhere in the language of the CBA. The Arbitrator in this instance conflated the "just cause" language from Article III with the terms of the ACP to fashion a new requirement that the Company conduct an investigation into the facts surrounding an employee's accumulation of 12 points under the ACP. (Arbitration Award 21). Moreover, the Arbitrator essentially fashioned an additional subjective condition by requiring the Company "to make a full, fair and informed determination of whether exercise of its discretion to impose a suspension" and then held the Company failed in this regard, although the CBA explicitly leaves this determination to the Company's discretion and Jenkins never requested that he be suspended. (Arbitration Award 22). By the CBA's own explicit language, this provision of the ACP affords the Company the right to terminate any employee who exceeds 12 points under the attendance policy.

Courts interpreting no-fault attendance policies like the one at issue here have routinely upheld the discharge of employees who violate those policies, regardless of the reasons for the violation or the circumstances surrounding it. *See, e.g.*, *Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109, 1113 (6th Cir. 1997) (because employee did not have a "serious health condition" under the FMLA, employer did not breach CBA when it terminated employee under attendance policy although he claimed his car battery died and was unaware he was scheduled to work); *Njaim v. FCA US LLC*, No. 3:16CV1351, 2018 WL 3629591, at *4-7 (N.D. Ohio July 31, 2018) (finding employer did not breach CBA's attendance policy where the sole reason for employee's absence was his substance abuse and mental illness and he failed to submit a disability accommodation until after he was terminated); *Peebles v. A. Schulman Inc.*, No. 3:04-0754, 2006 WL 572337, at

*10-12 (M.D. Tenn. Mar. 7, 2006) (finding plaintiff was rightfully terminated under employer's attendance policy although policy was not uniformly enforced, and the lack of uniformity did not discriminate against workers belonging protected class); *Painter v. Mazda Motors Mfg. (USA) Corp.*, No. 91-CV-73466-DT, 1992 WL 521118, at *10-13 (E.D. Mich. Mar. 17, 1992) (finding employer did not breach CBA for terminating employee when she accumulated points under attendance policy although she missed work due to three-and-a-half inches of snow). Under the facts of the present case, the conclusion is the same: Jenkins was terminable under the ACP of the CBA for accruing 12 points regardless of the reasons why or how he accrued them.

The CBA in the present case also contains a provision instructing that the Arbitrator "shall neither add to nor subtract from any of the provisions." (CBA 17). "[W]hen a [CBA] prohibits the addition of contract terms, the arbitrator may not proceed to do so." *Thomas & Betts*, 182 F.3d at 472. Much like in *Thomas & Betts*, the Arbitrator imposed additional requirements which were not written in the agreement when he required the Company to conduct an investigation and engage in deliberation relating to Jenkins' accumulation of 12 points under the ACP. *See id.* (finding that the Arbitrator imposed upon the company a requirement that it "may not unreasonably withhold excusing an employee's absence."). This amounts to the Arbitrator entirely disregarding the language of the CBA providing that the Company, "may, at its discretion, impose a 30[-]day suspension as a final step in the disciplinary process for employees with 20 or more years of service in an effort to impress upon the employee the gravity and severity of the situation." (CBA 53); *see Thomas & Betts*, 182 F.3d at 472 (citing *Misco*, 484 U.S. at 38). Under the plain language of the ACP, Jenkins' objective accumulation of 12 points within one year entitled the Company to terminate his employment. The Arbitrator's decision thus did not take its essence from the CBA,

13

but instead improperly imposed his personal notion of industrial justice. *See Mich. Family*, 475 F.3d at 753. Accordingly, the decision of the Arbitrator will be vacated.

## V. CONCLUSION

For the reasons provided above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (DN 18) is **GRANTED**, and Defendant's Motion for Summary Judgment (DN 17) is **DENIED**. The decision of the Arbitrator is thus **VACATED**.

Greg N. Stivers, Chief Judge
United States District Court

June 17, 2019

cc: counsel of record